## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| LORNA SHIELDS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket no. 2:19-cv-00448-GZS |
| | ) |
| UNITED OF OMAHA LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON PENDING CROSS-MOTIONS

Before the Court are two Cross-Motions: (1) the Motion for Judgment on the Administrative Record by Defendant United of Omaha Life Insurance Company (ECF No. 56); and (2) the Motion for Judgment on the Record by Plaintiff Lorna Shields (ECF No. 58).  Having reviewed these Cross-Motions and the related memoranda filed by the parties (ECF Nos. 62 & 64), the Court GRANTS Defendant's Motion (ECF No. 56) and DENIES Plaintiff's Motion (ECF No. 58).

### I.   STANDARD OF REVIEW

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, allows a participant or beneficiary to bring an action "to recover benefits" under a plan governed by the statute.  See 29 U.S.C. § 1132(a)(1)(B).  "In th[is] ERISA context, summary judgment [or, as titled here, a motion for judgment on the record] is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'"  Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)).  As a first step, "an inquiring court must peruse the plan documents in

order to determine the standard of judicial review applicable to a claims administrator's denial of benefits."[1] McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015).

A challenge to a denial of benefits is reviewed de novo "unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc., 813 F.3d 420, 427 (1st Cir. 2016) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). "Where the delegation of discretionary authority is sufficiently clear and notice of it has been appropriately provided, the claims administrator's decision will be upheld unless it is arbitrary, capricious, or an abuse of discretion." Id. Under this standard, "a reviewing court asks whether a[n] . . . administrator's determination is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record." Niebauer v. Crane & Co., 783 F.3d 914, 923 (1st Cir. 2015) (internal quotation marks omitted). An administrator's decision "must be upheld if there is any reasonable basis for it." Madera v. Marsh USA, Inc., 426 F.3d 56, 64 (1st Cir. 2005).

Separate and apart from a claim to recover plan benefits, ERISA allows for a plan participant or beneficiary to "obtain other appropriate equitable relief" to "redress . . . violations" or "enforce any provisions" of the plan or ERISA. See 29 U.S.C. § 1132(a)(3); see also Varity Corp. v. Howe, 516 U.S. 489, 512 (1996) (describing § 1132(a)(3) as a "catchall" provision "offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy"). Because such claims are addressed in the first instance in the

---

[1] "ERISA-governed plans . . . often have two types of 'administrators.'" Butler v. United Healthcare of Tenn., Inc., 764 F.3d 563, 570 (6th Cir. 2014). "The first type—a claims administrator—is the entity that administers claims for employee welfare benefit plans and has authority to grant or deny claims." Id. (internal quotation marks omitted). "The second type—a plan administrator—is usually the employer who adopted the benefit plan in question." Id. (internal quotation marks omitted).

district court, they "requir[e] no deference to any administrator's action or decision." Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 427 (6th Cir. 2006); see also Mercier v. Boilermakers Apprenticeship & Training Fund, No. 1:07-cv-11307-DPW, 2009 U.S. Dist. LEXIS 14263, at *53–54 (D. Mass. Feb. 10, 2009) ("As a general rule, claims for breaches of fiduciary duty [under § 1132(a)(3)], unlike denial of benefits claims, are addressed in the first instance by a district court and require no deference to any administrator's action or decision.").

## II.     FACTUAL BACKGROUND[2]

### A.  The Parties

Defendant United of Omaha Life Insurance Company (hereinafter, "United") is licensed to conduct the business of insurance in the State of Maine.  Prior to 2008, United issued a basic Group Term Life policy[3] as well as a voluntary Group Term Life policy[4] to Duramax Marine LLC ("Duramax"), a Maine employer.

Plaintiff Lorna Shields is the widow and beneficiary of Myron Shields.  In 2008, Myron Shields was hired by Duramax and offered life insurance coverage under Duramax's plans.  Myron elected coverage under both the basic and voluntary life insurance plans offered by his new employer.  In August 2017, while still employed at Duramax, Myron was diagnosed with cancer. On June 5, 2018, Myron, then sixty years old, passed away.  (See AR, PageID # 400.)  Following his passing, Lorna sought life insurance benefits from United under both plans.  United ultimately

---

[2] All citations in the section reference the 281-page Administrative Record ("AR") previously filed with the Court. See ECF No. 15.  For clarity, the Court uses the "PageID #" generated by CM/ECF for all AR pin citations.

[3] See AR, PageID #s 143–88, which contains Policy No. GLUG-250H, as revised January 2017 (hereinafter, "Basic Life").

[4] As will be discussed further in the following section, the record contains two versions of the voluntary life policy, GVTL-250H (hereinafter, "Voluntary Life").  The first version ("2017 Voluntary Life" or "VL2017") was revised and became effective on January 1, 2017.  See AR, PageID #s 189–237.  The second version ("2007 Voluntary Life" or "VL2007") was effective as of January 1, 2007.  See AR, PageID #s 317–66.

paid Ms. Shields a total of $236,000 in life insurance benefits in July 2018.[5]  Believing that United had improperly capped the benefits available to her under the Voluntary Life policy, she appealed United's determination and then filed the pending case.

### B.  The Plans

At Duramax, the United Basic Life plan provided coverage in an amount up to twice the employee's salary, not to exceed $300,000.  (AR, PageID # 255–56.)  This benefit could then be supplemented by the United Voluntary Life plan, which provided additional coverage in an amount equal to 1x, 2x, or 3x the employee's salary, not to exceed $200,000.  (AR, PageID # 330.)

The record contains two versions of the Voluntary Life plan, Group Policy No. GVTL250H.  The two versions are similar in many but not all respects.  When Myron Shields enrolled in the Voluntary Life plan, it was governed by a version that is dated 2007.[6]  (AR, PageID #s 317–66 (hereinafter, "2007 Voluntary Life" or "VL2007").)  Under this 2007 version, in order to receive coverage above $100,000 (the "Guarantee Issue" or "GI" limit), the applicant was required to provide "Evidence of Good Health" (also referred to herein as "Evidence of Insurability" or "EOI").  (Id.)  Coverage above the GI limit began when United "approve[d] the statement of physical condition or other evidence of good health," provided that the employee was "Actively Working on that day."[7]  (AR, PageID # 334.)  Regarding inquiries, the policy instructed the insured: "If You have any questions about Your Plan, You should contact the Plan

---

[5] This amount reflected all of the benefits Shields sought under the Basic Life policy, plus an additional $100,000 under the Voluntary Life policy.

[6] The Court notes that VL2007 appears to have been added to the administrative record in response to a September 2018 query from Diane Quinones, the United appeals specialist who ultimately drafted the 10/4/18 appeal denial letter.  See AR, PageID # 367 ("requesting the policy booklet for GVTL-250H that was effective prior to 1/1/09").  This version of the Voluntary Life policy was also attached to Plaintiff's Complaint.  See ECF No. 1-1.

[7] "Actively Working" is defined in the plan as working "30 hours or more each week."  AR, PageID # 332.  This active work requirement applied to coverage below or above the GI limit.  AR, PageID #s 320 & 333–34.

Administrator."  (AR, PageID # 361.)  As noted in this version of the plan documents, Duramax

served as policyholder and plan administrator (AR, PageID #s 329, 359) while United acted as

both the claims administrator and payer of claims (AR, PageID #s 347–48, 354–57).

As of January 1, 2017, the Duramax Voluntary Life plan was updated.   (AR,

PageID #s 189–237 (hereinafter, "2017 Voluntary Life" or "VL2017").)   The 2017 version

contains the same $100,000 GI limit but no longer refers to "good health."  Instead, it refers to

"Evidence of Insurability," (also referred to herein as "Evidence of Insurability" or "EOI") which

it defines as follows:

> Evidence of Insurability means proof of good health acceptable to Us.  This proof
> may be obtained through questionnaires, physical exams or written documentation,
> as required by Us.

(Id., PageID # 229.)   Additionally, the 2017 Voluntary Life policy also contains the following

language concerning the effect of premium payments:

PAYMENT OF PREMIUMS THROUGH PAYROLL DEDUCTION

> You are responsible for the payment of premiums for insurance for You and/or
> Your Dependent(s) under the Policy. The premium owed by You equals the total
> premium for all Insured Person(s).

> Premiums will be automatically deducted from Your paychecks by the
> Policyholder, then remitted to Us, as authorized by You during the enrollment
> process. Please contact the Policyholder for information regarding Your paycheck
> deductions.

> *Payment of premium does not guarantee eligibility for coverage.*

(AR, PageID # 217) (emphasis added).  Finally, this more recent version of the Voluntary Life

plan attaches a group policy between Duramax and United.  (AR, PageID #s 189–95.)   This

agreement contains the following provision regarding Duramax's responsibilities as the

policyholder:

> The Policyholder is responsible for enrolling eligible persons for coverage under
> this Policy and performing other administrative duties agreed to by Us.   The

> Policyholder will perform its responsibilities in accordance with the terms of this Policy and Our policies and procedures.  The Policyholder may delegate some of its responsibilities to a third party.  The Policyholder agrees to indemnify and hold Us harmless from and against any and all claims, actions, damages, liability and expenses, including, without limitation, reasonable attorneys' fees, arising from or related to the failure of the Policyholder, or a third party to whom the Policyholder has delegated its responsibilities, to perform its responsibilities in accordance with the terms of this Policy or Our policies and procedures.

(Id., PageID # 191.)

The respective roles of Duramax and United do not appear to have changed in 2017. Duramax acknowledges that, dating back to 2008, United had provided it with a form entitled "Evidence of Good Health" ("EOI form") "with the expectation that Duramax would have the form completed by any employee who elected [coverage above the GI limit]."   (See AR, PageID # 256.)   The expectation appears to have been that Duramax would then forward the completed EOI form to United.

### C. The Enrollment & Coverage

Upon his hiring in 2008, Duramax provided Myron with "a variety of paperwork, including, but not limited to, election forms for employment-related benefits . . . ." (AR, PageID # 256.)  He signed two separate "Salaried Election Forms."  (AR, PageID #s 419, 421–22.) On one form, he elected various company-paid benefits, which included the Basic Life coverage of twice his annual salary.  (AR, PageID # 419.)  On the second "Salaried Election Form," Myron elected Voluntary Life coverage in an amount equal to 3x his salary—an amount exceeding the GI limit.  (AR, PageID #s 421–22.)  On both forms, he designated his spouse, Lorna Shields, as his beneficiary.[8]  The only mention of an EOI requirement on the election form was in the signature section:

---

[8] The AR also includes an updated designation of beneficiary form signed by Myron and dated December 12, 2014 that again designated his wife, Lorna, as his primary beneficiary and named his daughter as a secondary beneficiary. See AR, PageID # 420.

> I authorize Duramax Marine to withdraw contributions from my pay for the coverages I have selected (if any).  I understand that if I elect any coverage in the future, which I have now refused, that coverage may be conditional upon my furnishing satisfactory evidence of insurability information.

(AR, PageID # 422.)  With these election forms received, Duramax began deducting Voluntary Life premiums from Myron's pay for coverage at the 3x rate.  (AR, PageID #s 247 & 257.)

Myron was not provided with the EOI form by Duramax or otherwise informed that he was required to provide EOI in order to receive Voluntary Life coverage in excess of $100,000.[9]  (AR, PageID # 256.)  United did not request EOI.  (AR, PageID # 257.)  In the context of this case, United maintains that it makes the insurability determination when it is advised that an employee is enrolling for coverage that requires Evidence of Insurability.  (Def. Response SMF (ECF No. 63), PageID #s 696–97.)  There is no evidence that United was so advised at the time Myron made his initial election.

In the ensuing years, Duramax worked with an insurance broker, Chapman and Chapman, Inc., to secure continued life insurance coverage for its employees.  (AR, PageID # 255.)  In 2012, 2014, and 2016, Duramax provided Chapman with its census data (Censuses (ECF Nos. 66-1– 66-3), PageID #s 748–55)—containing, as relevant here, the elections of each employee (although, in at least one case, without including employees' names)—which Chapman in turn presented to United in order to obtain new quotes (see AR, PageID #s 259–81).  These censuses included the base salaries of the employees and how much Voluntary Life coverage each employee had elected. The censuses did not indicate whether EOI had been provided by Myron or any other Duramax

---

[9] Defendant "[d]enies that neither Duramax nor United informed [Myron] that Evidence of Insurability was required for coverage above the Guarantee Issue Amount."  Def. L.R. 56(c) Response (ECF No. 63), PageID # 695.  In so denying, Defendant asserts that "[t]he Certificate of Insurance, provided to employees, states this requirement explicitly," citing the 2017 Voluntary Life certificate.  See AR, PageID # 204.  It is unclear on what basis Defendant believes that the Myron was presented with a 2017 certificate contemporaneously with his 2008 hiring or even that he received this certificate later.

employee.  In any event, United admits that it did not verify that employees were properly enrolled at their desired level of insurance coverage in connection with the biannual review of the Duramax census data.  (See Def. Response to Pl. Interrogatories (ECF No. 43), PageID # 545.)  Ultimately, United only learned that it had never received EOI for Myron Shields following the 2018 claim.

In August 2017, Myron was diagnosed with cancer.  (AR, PageID # 371.)  That September, he contacted Duramax's Human Resources Manager, Thomas Spann, to ask "if there [were] any scenarios that would deny [him life insurance benefits] short of not being an employee."  (AR, PageID # 250.)  Spann responded that he did "not know of any scenario where the GTL would not honor a death claim."  (AR, PageID # 249.)  Several weeks later, Myron asked for clarification as to the amount to which his beneficiary would be entitled.  (Id.)  Spann responded as follows:

> I read through your email and to clarify the Company Paid Group Term Life benefit I have attached a scanned copy of the original election forms...Company Paid & Voluntary Life.  The 2 times annual salary allows the benefit to be adjusted over time as your salary grows.  Your current value for GTL is $133k.  In addition, you carry Voluntary Life at 3 times your annual salary.  That value has grown to $188k.

(Id.)  No mention of EOI occurred in this exchange, nor is there evidence that Myron or Duramax at any time consulted with United.  Myron worked at Duramax through May 25, 2018.  (AR, PageID # 395.)  He remained employed at Duramax until his death on June 5, 2018.

### D.  The Claim

After Myron passed away, Lorna Shields contacted Spann to obtain a proof of death claim form.  Spann informed Lorna of the following:

> I will complete Part I and gather the required documents.  You will receive copies of the packet I will send to the Mutual of Omaha.  The Company caries 2X his base salary ($67,992).  The Group Term Life does not include any bonus dollars as part of the calculation.  Myron also carried additional Voluntary Life Insurance at 3X his base salary.  This amount was rounded down from $203,976 to $200,000 for self-billing purposes.

(AR, PageID # 251.)

On June 19, 2018, upon receiving the first part of the claim, a United claims analyst noted "Basic and VTL EE on census." (AR, PageID # 238.) The analyst further noted: "[e]nrollment shows EE elected 3x AE. Claim form also shows 3x AE .... Anything over 100k needs EOI. Checked Toga, did not find any EOI for the EE....," and "[n]eed to confirm if the EE was ever approved for an amount over the 100k GI. Email to PH." (Id.) That same day, the analyst emailed Spann to ask: "Was Evidence of Insurability ever submitted and approved for Myron Shields? If yes, please provide the approval notification. If not, please confirm." (AR, PageID # 402.) There is further notation in the record that "the broker attempted to have the contract revised but Underwriting could not make the determination to approve and/or make an exception." (AR, PageID # 314.) However, the record makes clear that United did not learn of the lack of EOI until it began its review of Lorna Shield's claim for benefits.

In July 2018, Lorna and her financial advisor called United. They spoke with at least two employees, including the claims analyst, and were told that amounts on the Voluntary Life policy over the $100,000 GI limit would be denied. (AR, PageID # 239.) Indeed, on July 16, 2018, United notified Lorna of the partial denial and disbursed $236,000—the amount owed under the Basic Plan ($136,000) plus the $100,000 Myron was eligible for under the Voluntary Life plan without EOI. (AR, PageID # 374.) However, with respect to the additional $100,000 of insurance above the GI limit, United explained that it had "no record of ever receiving or approving Evidence of Insurability for your husband." (Id., PageID # 375.) In relevant part, the denial letter quoted the following policy language: "Evidence of Insurability means proof of good health acceptable to Us. This proof may be obtained through questionnaires, physical exams or written documentation, as required by Us."[10] (Id., PageID # 374)

---

[10] This language appears to be taken from the 2017 Voluntary Life policy. See VL2017, PageID # 229 ("*Evidence of Insurability* means proof of good health acceptable to Us. This proof may be obtained through questionnaires, physical

Lorna filed an administrative appeal without the aid of an attorney, arguing that Myron "paid for the coverage amount of 3 times his annual income for which he enrolled via payroll deduction all this time and has never been advised that the face amount is unavailable or the payroll deduction is incorrect." (AR, PageID # 371.)  She further stated:

1. Myron paid all his premiums for 10 years, and you accepted the premiums which I believe you should honor your commitment.

2. Why would you accept his premiums for the coverage of 3 times his annual income and in the ten year span not once indicate that the face amount was unavailable or that the payroll deduction was incorrect?  How can Mutual of Omaha wash their hands of this situation?

(Id.)  She also noted that Myron had "checked multiple times to ensure" his family would receive the full amount of his elected coverage and "was assured everything was in order."  (Id.)

On October 4, 2018, United issued a letter upholding its initial determination.  (AR, PageID # 284.)  United again quoted policy language stating that approval of EOI was required before coverage above the GI limit would begin.[11]  (Id., PageID #s 284–85.)  Acknowledging that United had reviewed Lorna's appeal letter, the letter reiterated that, because "we did not receive and approve Evidence of Good Health, we are unable to allow the additional $100,000 of voluntary life insurance coverage."  (Id., PageID # 285.)   The letter further stated that Duramax would be notified "regarding a refund of premium."  (Id.)

Lorna retained counsel, who, in May 2019, sent United a letter asserting that she was entitled to receive amounts above the GI limit because United had waived its right to deny coverage by accepting premiums for ten years despite the fact it knew or should have known of the EOI issue.  (AR, PageID #s 244–45.)  Counsel further asserted that Duramax had acted as United's

---

exams or written documentation, as required by Us.").  This language differs from the EOI language contained in the 2007 Voluntary Life policy, which uses the term "evidence of good health" and does not provide a formal definition of that term.  See, e.g., AR, PageID # 334.

[11] Unlike the initial denial, the appeal denial relied exclusively on language taken from the 2007 Voluntary Life policy.

agent, allowing Duramax's actions (in particular, Spann's statements) to be imputed to United. (AR, PageID #s 245–46.)   United replied that it had reviewed counsel's letter, but "[t]he information provided [did] not change [its] prior determination."  (AR, PageID # 242.)

In March 2020, United refunded $8337.77 to Duramax, representing all premiums collected for Myron's coverage in excess of the GI limit.   (Heinen Decl. (ECF No. 56-1), PageID #s 648–49.)

## III.   DISCUSSION

Plaintiff's Complaint presses two counts under ERISA.  In Count I, she seeks to recover benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  (Compl. (ECF No. 1), PageID #s 8–10.)  In Count II, Plaintiff seeks "equitable relief," pursuant to 29 U.S.C. § 1132(a)(3), including "reformation of the Plan or the imposition of a surcharge to make the Plaintiff whole."  (Id., PageID # 10.)  The Court considers each claim in turn.

### A.   Count I:  Recovery of Plan Benefits

Here, the parties agree the plan at issue reserves discretionary authority to United and that, as a result, the arbitrary and capricious standard applies to this claim; thus, the Court reviews United's partial denial of benefits according to this deferential standard.  (See Pl. Mot. (ECF No. 58), PageID # 661; Def. Mot. (ECF No. 56), PageID # 638; see also AR, PageID # 361.)  However, in addition to asking the Court to review United's partial denial under this standard, Plaintiff asks the Court to consider two related issues in connection with Count I:  waiver and agency.  Following the lead of the parties' briefs, the Court first considers whether United's denial was arbitrary and capricious and then proceeds to consider Plaintiff's waiver and agency arguments.

#### 1.   Arbitrary and Capricious Review

The Court's "assessment of whether a decision under a plan is arbitrary and capricious can turn on several different considerations, often case-specific."   Lavery v. Restoration Hardware

Long Term Disability Benefits Plan, 937 F.3d 71, 78 (1st Cir. 2019) (internal quotation marks omitted).  "Where, as here, the plan administrator 'both evaluates claims for benefits and pays benefits claims,' courts weigh this structural conflict 'as a factor in determining whether there is an abuse of discretion.'"  Weeman v. Life Ins. Co. of N. Am., No. 2:18-cv-00278-JAW, 2019 U.S. Dist. LEXIS 165369, at *43–44 (D. Me. Sep. 26, 2019) (quoting Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 112, 115 (2008)) (internal quotation marks omitted); see also McDonough v. Aetna Life Ins. Co., 783 F.3d 374, 379 (1st Cir. 2015) (describing structural conflict as "a factor that a court may draw upon to temper the deference afforded to the claims administrator's decision").  Likewise, the First Circuit has recognized "procedural unreasonableness" as a factor. Lavery, 937 F.3d at 78 (citing Metro. Life, 554 U.S. at 118).  Considering all of these factors and the fiduciary role played by United, the Court's review of the partial claim denial here can be framed by asking: "To what extent has [United] conducted itself as a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may?"  Id.  (describing this inquiry as a "helpful" way to frame the arbitrary and capricious inquiry).

Plaintiff initially contends that Defendant's denial of benefits was arbitrary and capricious, citing relevant plan language concerning the beginning of coverage.[12]  In relevant part, the plan states that coverage in excess of the GI limit begins "on the first day of the Policy month which coincides with . . . the day We approve the statement of physical condition or other evidence of good health." (AR, PageID # 334.)  Focusing on the "other evidence of good health," Plaintiff maintains that United abused its discretion by reading the Plan to require the submission of a

---

[12] In her Response to Defendant's Motion, Plaintiff observes that United's denial of her administrative appeal relied solely upon terms from the 2007 Voluntary Life policy, but Defendant now attempts to utilize terms from the 2017 Voluntary Life policy in this proceeding.  See Pl. Response (ECF No. 64), PageID #s 702–05.  Given that Defendant relied on language from the 2007 Voluntary Life policy in deciding Plaintiff's administrative appeal, the Court concludes it is appropriate to conduct its review of the decision utilizing the language from the 2007 Voluntary Life plan.  See Glista v. UNUM Life Ins. Co. of Am., 378 F.3d 113, 129–32 (1st Cir. 2004).

specific EOI form (See Pl. Mot. (ECF No. 58), PageID #s 664–65.)  Plaintiff asserts that "other evidence of good health" could include Myron's "daily presence at work," and Defendant's acceptance of premiums could constitute approval.  (Id., PageID # 665.)

In the Court's view, this plan language unambiguously required United to "approve" some evidence of the good health of the employee in order to trigger coverage above the GI limit.  See Martinez v. Sun Life Assurance Co. of Canada, 948 F.3d 62, 69 (1st Cir. 2020) ("ERISA contract language is ambiguous only if the terms are inconsistent on their face or allow reasonable but differing interpretations of their meaning." (internal quotation marks omitted)).  Unfortunately for Plaintiff, Myron had provided no evidence at all.  Because, under the terms of the plan, "active work" was a prerequisite for any coverage under the Voluntary Life plan, above or below the GI limit, Plaintiff's novel suggestion that the "other evidence" plan language might have been satisfied by Myron's attendance at work would effectively read the GI limit and EOI requirement out of the policy altogether.  (AR, PageID #s 332–34.)  In short, the Court finds that United adopted a reasonable construction of the plan when it concluded that Myron's failure to submit any evidence of good health meant that he never became approved for voluntary life insurance above the GI limit.[13]  See Vendura v. Boxer, 845 F.3d 477, 482 (1st Cir. 2017) (explaining that courts "defer to plan administrators when they reasonably construe ambiguous plan terms" (internal quotation marks omitted)); D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 36–41 (1st Cir. 2011) (explaining that an unreasonable construction of plan language by a plan administrator constitutes an abuse of discretion).  In reaching this conclusion, the Court has ultimately determined that Defendant's dual role as both claims administrator and payer of claims

---

[13] While the Court has focused its review of Defendant's plan construction on the 2007 version of the plan, which Defendant cited in its 10/4/18 letter denying Plaintiff's administrative appeal, the Court notes that it would reach this same conclusion using the applicable language from the 2017 Voluntary Life plan. See AR, PageID #s 284–85.

did not impact its determination of this claim.  See Troiano v. Aetna Life Ins. Co., 844 F.3d 35, 45

(1st Cir. 2016) ("The beneficiary . . . bears the burden of showing that the conflict influenced the

Plan administrator's decision in some way.").

### 2.  Waiver

Alternatively, Plaintiff next asserts that Defendant knew that Myron had failed to provide

EOI and, by still accepting premiums, waived the EOI requirement.  (Pl. Mot., PageID #s 665–

66.)  Defendant, meanwhile, counters that (1) the First Circuit has not embraced the doctrine of

waiver in ERISA cases; (2) even if this Circuit recognized the doctrine, it could not be used to

expand the scope of coverage; and (3) Defendant's lack of knowledge of Myron's ineligibility

precluded its waiver of the EOI requirement.  (Def. Response, PageID #s 683–88.)

"ERISA-regulated employee benefit plans are interpreted according to principles of federal

common law," which are developed by the federal courts.  Martinez, 948 F.3d at 69; see D&H

Therapy, 640 F.3d at 36 ("[T]he Court . . . held that courts must develop a 'federal common law

of rights and obligations under ERISA-regulated plans.'") (quoting Firestone Tire & Rubber Co.

v. Bruch, 489 U.S. 101, 110 (1989)).  The development of an ERISA waiver doctrine in the First

Circuit has been incremental.[14]  The First Circuit has previously held that a beneficiary can waive

her rights under an ERISA plan.  See Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d

580, 587 (1st Cir. 1993).  Additionally, the Circuit has recognized that a claims administrator could

be barred from first raising new bases for the denial of a claim in litigation that it could have raised

earlier.  See Glista v. UNUM Life Ins. Co. of Am., 378 F.3d 113, 129 (1st Cir. 2004).  However,

---

[14] There has also been some development in the area of equitable estoppel, a related doctrine.  See, e.g., Russo v. Valmet Inc., No. 2:19-cv-00324-DBH, 2020 U.S. Dist. LEXIS 14708, at *7–9 (D. Me. Jan. 29, 2020).

Defendant is correct to observe that the First Circuit has not spoken explicitly on the Plaintiff's proposed application of the doctrine to a prerequisite for coverage.[15]

Assuming without deciding that the First Circuit would recognize a viable waiver claim in this context, the Court turns to the merits of Plaintiff's assertion of waiver on the record presented. "Waiver is famously defined as 'an intentional relinquishment or abandonment of a known right or privilege.'" Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 10 (1st Cir. 2007) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). "The inquiry into waiver consists of two questions: whether a party actually knew [it] was relinquishing a [right or] benefit, and whether [it] acted voluntarily in doing so." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 182 (1st Cir. 1995) (elaborating upon standard for waiver of ERISA benefits and noting that it is "a fact-intensive exercise"). Here, because Defendant lacked actual knowledge of the lack of approved EOI, it necessarily did not know it was relinquishing a right by accepting premiums. Accordingly, Plaintiff's waiver claim fails on the first question.

Moreover, even if the Court were to conclude that United in fact acted knowingly in excusing Shield's failure to submit EOI, what Plaintiff seeks to establish through that waiver is essentially additional guaranteed issue coverage. However, "waiver cannot be employed to create coverage." Coastal Med., Inc. v. Reliance Standard Life Ins. Co., No. 1:15-cv-00520-JJM-LDA, 2017 U.S. Dist. LEXIS 117015, at *11 (D.R.I. July 24, 2017). Plaintiff urges the Court to view United as having simply relinquished "a condition precedent to coverage." (Pl. Reponse (ECF No.

---

[15] Other Circuits are split as to whether, and in what circumstances, a claim of waiver may be viable. Notably, only the Fourth Circuit has explicitly closed the door on such claims. Compare, e.g., Salyers v. Metropolitan Life Ins. Co., 871 F.3d 934, 938 (9th Cir. 2017) (waiver claim viable); Pitts v. Am. Sec. Life Ins. Co., 931 F.2d 351, 357 (5th Cir. 1991) (same); with Witt v. Metropolitan Life Ins. Co., 772 F.3d 1269, 1279 (11th Cir. 2014) (open question whether waiver claim viable); Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 650 (7th Cir. 1993) abrogated on other grounds by Coker v. Trans World Airlines, Inc., 165 F.3d 579, 585 (7th Cir. 1999) (same); and White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 29 (4th Cir. 1997) (waiver claim not viable).

64), PageID # 706.)   However, on the record presented, the Court disagrees with this characterization and, as a matter of law, concludes that United's alleged waiver cannot provide a basis for Plaintiff to receive benefits above the GI limit.   See, e.g., Juliano v. HMO of N.J., Inc., 221 F.3d 279, 288 (2d Cir. 2000) ("[W]hen insurance coverage is denied, where the issue is the existence or nonexistence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable." (internal quotation marks omitted)); Everett v. United of Omaha Life Ins. Co., No. 3:11-cv-00926-MEM, 2013 U.S. Dist. LEXIS 146013, at *29–30 (M.D. Pa. Oct. 9, 2013) ("Particularly with respect to evidence of good health, . . . courts have found that where evidence of good health is a required element for coverage, it cannot be waived as it is the plaintiff's burden to establish that she is entitled to benefits in an action brought pursuant to a contract or federal law."); Heller v. Cap Gemini Ernst & Young Welfare Plan, 396 F. Supp. 2d 10, 27–28 (D. Mass. 2005) (following Juliano).

### 3.  Agency and the Relationship between United and Duramax

Plaintiff alternatively argues that waiver can be established based on Duramax's actions because Duramax acted as Defendant's agent.  Specifically, Plaintiff contends that Duramax "had actual or apparent authority to implement, on United's behalf, any requirement that persons applying for voluntary life insurance coverage in excess of the Guarantee Issue Limit complete and submit an 'Evidence of Good Health' form."  (Pl. Mot., PageID # 670.)  As a result, Plaintiff contends, "Duramax's conduct with regard to that requirement is attributed to United," and Duramax "unmistakably waived the alleged requirement that Myron supply documentary 'Evidence of Good Health.'"  Id.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."

16

Restatement (Third) of Agency § 1.01 (2006) ("Restat. 3d"); <u>see also, e.g.</u>, <u>Carreras v. PMG Collins, LLC</u>, 660 F.3d 549, 556 (1st Cir. 2011) ("An agency relationship would exist only if ISG had manifested its assent to have Rosario act on its behalf and subject to its control.") (citing Restat. 3d § 1.01). "An essential element of agency is the principal's right to control the agent's actions." <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 713 (2013) (quoting Restat. 3d § 1.01 cmt. f). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restat. 3d § 1.01 cmt. f.

"In the insurance context, agency law dictates that an insurer's or policyholder's agent can typically waive the rights of its principal when it has either actual or apparent authority to do so, or when the principal later ratifies its agent's actions." Restatement of the Law, Liability Insurance, § 5 cmt. b (2019); <u>see also</u> Restat. 3d § 2.01 intro. note. "An agency relationship based on actual authority arises when 'the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act.'" <u>Veritex Cmty. Bank v. Osborne (In re Osborne)</u>, 951 F.3d 691, 704 (5th Cir. 2020) (quoting Restat. 3d § 2.01). Under the doctrine of apparent authority, "a principal may be bound by a purported agent's acts . . . when a third party reasonably believes the agency relationship to exist and that reasonable belief can be traced to the principal's manifestations." <u>Vázquez-Robles v. CommoLoCo, Inc.</u>, 757 F.3d 1, 6 (1st Cir. 2014); <u>see also</u> Restat. 3d § 2.03. Additionally, "notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal . . . ." Restat. 3d § 5.03; <u>see also</u> <u>Rai v. WB Imico Lexington Fee, LLC</u>, 802 F.3d 353, 360 (2d Cir. 2015) ("[A] person has notice of a fact if his agent has knowledge of the fact,

reason to know it or should know it, or has been given a notification of it.") (quoting Restatement (Second) of Agency § 9(3) (1958)).

The extent to which the just-described principles of federal common law on agency can be applied to the relationship between a policyholder-employer and an insurer under ERISA is unclear.  The Supreme Court has not explicitly closed the door on such claims under federal common law.[16]  See UNUM Life Insurance Co. of America v. Ward, 526 U.S. 358 (1998). However, the Court has warned:

> [D]eeming [a] policyholder-employer the agent of the insurer would have a marked effect on plan administration.  It would force the employer, as plan administrator, to assume a role, with attendant legal duties and consequences, that it has not undertaken voluntarily; it would affect not merely the plan's bookkeeping obligations regarding to whom benefits checks must be sent, but [would] also regulate the basic services that a plan may or must provide to its participants and beneficiaries.

Ward, 526 U.S. at 379 (internal quotations marks omitted).

In support of her agency argument, Plaintiff relies principally on a single case: Salyers v. Metropolitan Life Insurance Co., 871 F.3d 934 (9th Cir. 2017).  In Salyers, an insurer-claims administrator denied life insurance benefits based on the insured's omission to provide EOI.  Id. at 936–37.  The district court found that the insurer and the employer-policyholder had "created a system in which [the employer] was responsible for interacting with plan participants and [the insurer] remained largely ignorant of individual plan participants' coverage elections."  Id. at 938. As a result of this configuration, the insurer was unaware that the insured had elected coverage in an amount requiring EOI until the insured's beneficiary made her claim for benefits.  Id.  In the ensuing litigation, the beneficiary contended that the insurer's "purported ignorance of the facts

---

[16] The Supreme Court has, however, held that ERISA preempts state common law agency principles.  Ward, 526 U.S. 358.

[did] not negate its obligation to pay the entire [claim] because, under agency law, [the employer's] knowledge [could] be attributed to [the insurer]." Id. at 939.

Noting the absence in the record of the group policy defining the relationship between the insurer and employer, the Ninth Circuit concluded that the employer had apparent authority, or even implied actual authority, to enforce the EOI requirement on the insurer's behalf. Id. at 940. Relevantly, the Circuit also noted both that (1) the district court had "found that [t]he task of flagging policies for missing evidence of insurability was delegated to [the employer]," id. at 940 (internal quotation marks omitted); and (2) its holding did not mean "that a policy-holder employer is always an agent of the insurer in every aspect of plan administration in which it participates," id. at 941.

First, the Court observes that Salyers is far from the majority rule; indeed, no other circuit appears to have adopted its views on agency in the ERISA context.  While the First Circuit has not had occasion to consider Salyers, the Court declines Plaintiff's invitation to predict that the First Circuit would adopt Salyers and apply it in this case.  See, e.g., Walley v. Agri-Mark, Inc., 2003 U.S. Dist. LEXIS 17059, *7 (D. Mass. September 30, 2003) ("[P]laintiff's argument . . . is premised upon the idea that the plan administrator is the insurer's agent.  This is simply not the law.") (citing Ward, 526 U.S. at 378–79); McBride v. Hartford Life & Accident Ins. Co., No. 05-cv-06172, 2007 U.S. Dist. LEXIS 16917, at *55 (E.D. Pa. Jan. 29, 2007) ("The majority view holds that an employer does not act as the agent of an insurance company that has issued a group policy.").  Rather, the Court believes this Circuit would favor the Second Circuit's approach in Sullivan-Mestecky v. Verizon Communs. Inc., 961 F.3d 91 (2d Cir. 2020).

In Sullivan-Mestecky, the plaintiff's mother purchased a life insurance policy based on her former employer-plan administrator's representations that she was eligible for nearly $700,000 in

coverage.  961 F.3d at 96.  Unbeknownst to her, this estimate was skewed by a data input error

that had greatly inflated her income.  Following her mother's passing, the plaintiff submitted a

claim, which the insurer-claims administrator rejected in part, ultimately paying less than $12,000

on the claim.  Id. at 97.  The daughter sued both the employer and the insurer.[17]  The Second

Circuit held that the plaintiff had stated a colorable § 1132(a)(3) claim against her mother's

employer for equitable relief based on its misrepresentations but not against her insurer, noting the

insurer's relative lack of interaction with the plaintiff's mother and holding as follows:

> As the plan administrator, [employer], not [insurer], was responsible for assessing
> [decedent's] eligibility for and enrolling [decedent] in her benefits plan.  The core
> of [plaintiff's] dispute was therefore with [employer].  Even if [insurer] could have
> checked [employer's] work to confirm that [decedent] had been properly enrolled,
> it had no duty to do so . . . .

Id. at 103–04.  Notably, the Second Circuit did not even consider imputing the employer's

misrepresentations or duties to the insurer or vice versa.

Second, Salyers is factually distinguishable in several key respects.  Unlike in Salyers, the

record here includes the Duramax-United group policy, which makes clear that Duramax did not

have actual authority to act on Defendant's behalf.[18]  (See AR, PageID # 191.)  Further, concerning

apparent authority, it is not obvious how a plan participant would have reasonably believed

Duramax collected EOI on Defendant's behalf given that it has not been shown that Duramax ever

collected EOI at all.  Relatedly, it is unclear how Duramax could have manifested assent to act as

Defendant's agent in the collection of EOI given Duramax's seeming lack of any awareness it had

been so tasked.  It is also not apparent that United exercised any control over Duramax.  See

---

[17] Notably, in this case, Plaintiff has elected not to name Duramax as a defendant in this action.

[18] While the Court relies on VL2017 for this language, Plaintiff has not shown that the group policy agreement between
Duramax and United was fundamentally different prior to 2017.  Additionally, the 2017 language clearly applies to
any representation made by Duramax from 2017 forward, which includes the representations Spann made in response
to Myron's emailed questions regarding his life insurance coverage.

Hollingsworth, 570 U.S. at 713.  In sum, on the record presented, the Court does not find that Plaintiff can establish waiver of the plan's EOI requirement via Duramax's actions.

### B.  Count II:  Section 1132(a)(3) – Equitable Relief

In Count II, Plaintiff alternatively asserts that Defendant "breached its fiduciary duty by: (1) receiving Myron's application for voluntary life insurance in an amount exceeding the Guarantee Issue Limit; (2) accepting premiums in an amount that [Defendant] knew was calculated to pay for the coverage he had requested; (3) making an 'insurability determination,' finding Myron uninsurable; and (4) for ten years, saying nothing to suggest that it had not approved the coverage he had applied for."  (Pl. Mot., PageID #s 671–72.)  Defendant responds that it did not make an insurability determination, it did not owe a fiduciary duty to ensure that Myron satisfied the requirements for coverage, and, at most, it had only constructive knowledge of the EOI issue through the censuses, which is insufficient to establish a breach of fiduciary duty claim.  (Def Mot., PageID # 642; Def. Response, PageID # 689–90.)  Defendant asserts that any duty to inform Myron of the EOI requirement fell on Duramax as the plan administrator.  (Def. Mot., PageID # 644.)  Additionally, Defendant argues that Count II is an impermissible attempt to seek an additional equitable remedy when she already has a remedy for United's partial denial under 29 U.S.C. § 1132(a)(1).

### 1.  Relationship Between §§ 1132(a)(1) & (3)

The Court first addresses this last argument.  Generally, a plaintiff may not obtain relief under the catchall § 1132(a)(3) "when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks."  Silva v. Metro. Life Ins. Co., 762 F.3d 711, 726 (8th Cir. 2014).  Defendant cites LaRocca v. Borden, Inc., 276 F.3d 22, 29 (1st Cir. 2002), as well as a prior decision of this Court, Gallagher v. CIGNA Healthcare of Me., Inc., 538 F. Supp. 2d. 286 (D. Me. 2008) in support of its argument to limit Plaintiff's ability to

seek relief under § 1132(a)(3).  It is true that both of these opinions endorsed the view that "equitable relief under section 1132(a)(3) is inappropriate when a party is entitled to pursue plan benefits or enforce plan rights under section 1132(a)(1)(B)."  Gallagher, 538 F. Supp. 2d at 297 (quoting Kourinos v. Interstate Brands Corp., 324 F. Supp. 2d 105, 107 (D. Me. 2004));  see also LaRocca, 276 F.3d at 29 ("[W]hen the plaintiff can 'bring a claim for benefits under [Section a(1)], . . . equitable relief would not be appropriate . . . [and] she does not have a cause of action under [Section a(3)].'") (quoting Wald v. Southwestern Bell Corp. Customcare Med. Plan, 83 F.3d 1002, 1006 (8th Cir. 1996)).

However, Plaintiff urges the Court to consider the subsequently issued guidance from the Supreme Court found in in CIGNA Corp. v. Amara, 563 U.S. 421 (2011).  In Amara, the Supreme Court vacated reformation of an ERISA plan under § 1132(a)(1), but suggested that similar equitable relief could be provided under § 1132(a)(3).  See id. at 438-442.  Following Amara, other circuits have explicitly acknowledged that a plaintiff eligible for relief under § 1132(a)(1) may also alternatively seek relief under § 1132(a)(3).  See, e.g., Jones v. Aetna Life Ins. Co., 856 F.3d 541, 546–47 (8th Cir. 2017) ("Amara implicitly determined that seeking relief under (a)(1)(B) does not preclude seeking relief under (a)(3)."); Moyle v. Liberty Mut. Ret. Benefit Plan, 823 F.3d 948, 960 (9th Cir. 2016) (same).  While the First Circuit has yet to explicitly overrule LaRocca, it more recently has shown a willingness to consider the merits of a § 1132(a)(3) claim that accompanied an alternative claim under § 1132(a)(1).  See, e.g., O'Shea v. UPS Ret. Plan, 837 F.3d 67, 77–78 (1st Cir. 2016) (considering the merits of Plaintiff's claim for equitable relief which was brought along with a claim for benefits).  Following this lead, the Court assumes without deciding that post-Amara Plaintiff can alternatively seek relief for Defendant's partial denial under § 1132(a)(3).

### 2.   Merits

The initial hurdle in Plaintiff's claim that Defendant violated its fiduciary duties is determining when United was acting as a fiduciary.  "[U]nder ERISA, a person may be a fiduciary because he is so identified in a plan instrument or pursuant to a procedure specified in that instrument."  Wong v. FMR, LLC (In re Fid. ERISA Fee Litig.), --- F.3d ---, 2021 U.S. App. LEXIS 6481, at *6 (1st Cir. Mar. 5, 2021).[19]  "A person or entity can be a fiduciary of a plan for some purposes and not for others[,]" and whether the defendant was then acting as a fiduciary is a "threshold question" "[i]n every case charging breach of ERISA fiduciary duty."  Id. at *7 (quoting Pegram v. Herdrich, 530 U.S. 211, 226 (2000)).

"Congress has mandated ERISA fiduciaries to abide by certain strictures and has granted ERISA beneficiaries corresponding rights to sue for violations of those strictures."  Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 53 (1st Cir. 2014) (citing 29 U.S.C. § 1132(a)(3)).  "An ERISA beneficiary thus has a legally cognizable right to have her plan fiduciaries perform those duties that ERISA mandates."  Id.  These fiduciary duties obligate ERISA fiduciaries to act with "care, skill, prudence, and diligence" and to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a).  Equitable relief under § 1132(a)(3) need not be non-monetary; a Plaintiff may seek the equitable remedy of surcharge for "a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary."  Amara, 563 U.S. at 442.

Here, the Court is not convinced that Defendant's fiduciary duties as claims administrator extended to checking the work of Duramax to ensure that it fulfilled its fiduciary duty as plan administrator to inform Myron of the EOI requirement.  See Wong, 2021 U.S. App. LEXIS 6481,

---

[19] Additionally, "[a] person not named as a plan fiduciary may nevertheless become a 'functional fiduciary' depending on his relationship with the plan."  Wong, 2021 U.S. App. LEXIS 6481, at *6 (discussing 29 U.S.C. § 1002(21)(A)).

at *7; cf. Sullivan-Mestecky, 961 F.3d at 103–04 ("Even if [the insurer] could have checked [the employer's] work to confirm that [the decedent] had been properly enrolled, it had no duty to do so . . . ."). In the Court's view, such an intent is neither indicated in the plan, which instructs plan participants to direct their plan-related inquiries to Duramax (AR, PageID # 361), nor in ERISA itself, which unambiguously places responsibility "on plan administrators and not insurers" to furnish a summary plan description that communicates "'the plan's requirements respecting eligibility for participation and benefits' and 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits'" "in a manner calculated to be understood by the average plan participant," Prouty v. Hartford Life & Accident Ins. Co., 997 F. Supp. 2d 85, 90 (D. Mass. 2014) (quoting 29 U.S.C. § 1022).

Defendant has compiled close to a dozen different cases concluding that there can be no insurer liability under ERISA for improper or incomplete enrollments in life insurance plans where responsibility for the faulty enrollment is not tied to the insurer. (See Def. Mot., PageID #s 643–44 (collecting eleven district court cases).) Seeking to distinguish her own case from those cases cited by Defendant, Plaintiff relies on her factual narrative:

> Although United points to eleven district court cases to support this (rather sweeping) proposition, its reliance on those cases is misplaced: in none of them did the defendant insurer—as is the case here—have knowledge of the amount of the employee's coverage; become aware of the purported basis to deny coverage; accept premiums nonetheless; renew coverage on at least one occasion after becoming aware of that purported basis to deny coverage; decline to inform the plaintiff insured of that basis for denial; and then deny coverage after a claim was made.

(Pl. Response (ECF No. 64), PageID # 708.) In this respect, Plaintiff's § 1132(a)(3) claim, as argued, shares a fatal defect with Plaintiff's waiver claim; it ultimately rests on a factual premise—that Defendant made an "insurability determination" upon receiving the bi-annual censuses—that

is not established on the current record.  In short, Plaintiff has not met her burden of showing a breach of fiduciary duty by Defendant.

To be clear, Plaintiff's case is sympathetic, and it is troubling that Myron's defective enrollment became an issue only after he had paid incorrect premiums for nearly a decade.[20] Nevertheless, these considerations do not allow the Court to conclude Defendant breached any fiduciary duty it owed to Shields in this case.

## IV.    CONCLUSIONS OF LAW

In light of the just-stated factual findings and analysis of the legal issues presented, the Court makes the following conclusions as to the pending claims:

1) As to Count I (Recovery of Plan Benefits, 29 U.S.C. § 1132(a)(1)(B)), the Court concludes that Plaintiff has not met her burden of establishing that (a) Defendant's denial of benefits was arbitrary and capricious, or (b) Defendant knowingly and voluntarily waived the requirement to provide Evidence of Insurability.  As a result, Defendant is entitled to judgment on Count I.

2) As to Count II (Equitable Relief, 29 U.S.C. § 1132(a)(3)), the Court concludes that Plaintiff has not met her burden of establishing that Defendant breached its fiduciary duties, nor that Plaintiff is entitled to relief beyond the refund of premiums already issued.  As a result, Defendant is entitled to judgment on Count II.

---

[20] As the Fourth Circuit has discussed, one purpose of the surcharge remedy described in Amara is to prevent a situation where "fiduciaries would have . . . incentive to wrongfully accept premiums, even if they had no idea as to whether coverage existed . . . ."  McCravy v. Metro. Life Ins. Co., 690 F.3d 176, 183 (4th Cir. 2012).  Without the surcharge remedy, "[t]he biggest risk fiduciaries would face would be the return of their ill-gotten gains, and even this risk would only materialize in the . . . subset of circumstances where plan participants . . . needed the benefits for which they had paid.  Meanwhile, fiduciaries would enjoy essentially risk-free windfall profits from employees who paid premiums on non-existent benefits but who never filed a claim for those benefits."  Id.; cf. Salyers, 871 F.3d at 940 (extending agency doctrine to "prevent[] an insurer from relying on a compartmentalized system to escape responsibility").

## V.    CONCLUSION

For the reasons just stated, the Court GRANTS Defendant's Motion for Judgment on the Administrative Record (ECF No. 56) and DENIES Plaintiff's Motion for Judgment on the Record (ECF No. 58).  Judgment shall enter in favor of Defendant on all counts.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 16th day of March, 2021.